United States District Court
Western District of Texas
San Antonio Division

Valentia Coleman,
　　　Plaintiff,

　　　v.

Heather Wilson, Secretary of the Department
of the Air Force,
　　　Defendant.

No. SA-17-CV-00819-FB

**Defendant's Motion to Exclude Improper Prejudicial Evidence**

The government respectfully requests that the Court enter an order preventing the plaintiff from presenting irrelevant evidence, making prejudicial statements, and asking prejudicial questions about (1) an alleged 2010 sexual assault by Mr. Willie Monroe, (2) an alleged Air Force conspiracy to "cover up" accusations against Mr. Monroe, and (3) all other matters that were raised in a prior negotiated grievance and arbitration proceeding.

**Summary**

This is a federal-sector employment discrimination case in which the plaintiff, Ms. Valentia Coleman, asserts a claim for retaliatory hostile work environment.  She alleges that she is being subject to retaliation for giving a March 2015 statement to an Air Force investigator concerning an allegation of sexual misconduct that another female employee brought against Mr. Willie Monroe, a third-line supervisor in her work unit at Joint Base San Antonio ("JBSA").  The conduct of Ms. Coleman's counsel and union representative over the course of discovery suggests she will attempt to retry matters of workplace misconduct that were irrevocably submitted to arbitration through a union grievance process starting in January 2016 and on which she received an adverse ruling.  This includes what appears to be a deliberate attempt to inflame and unfairly prejudice the proceedings, by raising allegations that Mr. Monroe sexually harassed and assaulted her in 2010 and that the Air Force has been engaged in a conspiracy to cover up the accusations against Mr.

Monroe — matters that she submitted to the arbitrator and on which she received an adverse ruling, per the above.  Accordingly, the government respectfully requests that the Court prevent Ms. Coleman from re-raising these hollow accusations to pillory Mr. Monroe and the Air Force, rather than try her current retaliation case on the merits.

<b>Statement of Facts</b>

Ms. Coleman was hired to serve as an Emergency Management Specialist with the 502d Civil Engineering Squadron, Emergency Management Flight ("CES/CEX") at Randolph Air Force Base ("Randolph AFB") on or around March 2010. Exhibit 1 at 10, Exhibit 2.  Since 2015, Ms. Coleman has alleged that (1) Mr. Willie Monroe was the flight chief at Randolph AFB in 2010, (2) he began sexually harassing her shortly after hiring her, (3) he pressured her into having sex with him in his office at Randolph AFB, and (4) that she filed an informal Equal Employment Opportunity ("EEO") complaint in response to Mr. Monroe's conduct in 2010.  Exhibit 1 at 10, Exhibit 4 at 4.

But there are no documents or independent testimony to substantiate Ms. Coleman's allegation against Mr. Monroe and the records that do exist tell a different story.  Ms. Coleman did not file a police report, there are no documents corroborating the alleged EEO complaint, and base officials—including Mr. Monroe—are not aware of Ms. Coleman bringing any charges against him.  Exhibit 1 at 10.  Furthermore, records show that Mr. Monroe was stationed at Fort Sam Houston beginning in January 2010, was not in Ms. Coleman's chain of command, and did not maintain an office at Randolph AFB during the timeframe given in Ms. Coleman allegations. Exhibit 1 at 1; Exhibit 4 at 4, 7; Exhibit 5; Exhibit 6.

Starting on or around late 2013, as part of the creation of JBSA, the Department of Defense combined the separate emergency management groups at Randolph AFB, Lackland AFB, and Fort

Sam Houston into a single group located at Lackland AFB.  Exhibit 1 at 11.  At that time, Mr. Monroe became the Flight Chief for the combined organization and Ms. Coleman's third-line supervisor.  *Id*.  Ms. Coleman has repeatedly testified that she had a normal working relationship with Mr. Monroe and the rest of her work unit, at least until the events of 2015.  Exhibit 1 at 11, Exhibit 3 at 170, 186: 8-9.

There is, however, a long and well-documented history of workplace disputes between Ms. Coleman, her first-line supervisor, Greg Andrades, her second-line supervisor, Steve Clark, and other colleagues in the group, dating back to 2010.  Dkt. 7 at ¶ 9-12, Exhibit 1 at 11, 24-28, Exhibit 4 at 11-15, Exhibit 8.  Ms. Coleman had numerous reports of being absent without leave, using unprofessional language in the workplace, making hostile statements to coworkers, and accusing colleagues of gender and racial bias.  Exhibit 8, Exhibit 4 at 11-15.  Management eventually implemented a "buddy system" so that no employee would be left alone with Ms. Coleman.  Exhibit 4 at 15.  Yet, despite these problems in the workplace, Ms. Coleman performed her duties well; Mr. Andrades even offered her the opportunity to serve as his assistant so she could gain management experience and better position herself for a promotion.  *Id*.  Ms. Coleman responded by declining his offer and instead told Mr. Andrades "to just give her the promotion."  *Id*.  On the other hand, Ms. Coleman felt that she was being treated unfairly and subject to a hostile work environment because she was unlike the other members of the group, all of whom had retired from the military after 20 years of service.  Exhibit 3 at 155; Exhibit 9.  But none of these issues concerned Mr. Monroe.

Ms. Coleman only seemed to develop a problem with Mr. Monroe on or around early 2015, after learning that Ms. Sasha Wilson, an administrative assistant, had accused him of sexual harassment.  Exhibit 1 at 12.  Ms. Coleman and Ms. Wilson became close, with Ms. Wilson sharing

**Motion to Exclude Improper Prejudicial Evidence**                                                    **3**

details of her marital troubles and the alleged sexual harassment by Mr. Monroe.  Exhibit 1 at 12-13.  Sometime in February 2015, Ms. Wilson filed an EEO complaint against Mr. Monroe.  Dkt 7 ¶ 13.  Ms. Coleman gave a telephonic statement to an investigator on March 30, 2015 regarding Ms. Wilson's complaint. Exhibit 1 at 12-13.  There is no evidence that, at the time, anyone else in the flight had any knowledge that Ms. Coleman gave a statement against Mr. Monroe.  *See* Exhibit 1 at 41; Exhibit 3 at 192-93, 200-01; Exhibit 21.

Ms. Coleman wrote two e-mails to her section leader on June 10, in which she (a) alleged that she was being harassed and discriminated against and (b) requested a transfer to another work unit. Exhibit 1 at 13.  The letters were forwarded up the chain of command to Mr. Monroe, who denied the request.  Exhibit 1 at 14.  In the letter denying her request, Mr. Monroe expressed his opinion that Ms. Coleman's complaints about her supervisor were a result of her failure to follow administrative standards and that she also "alienated many members of the flight on multiple occasions" with her interpersonal conduct.  *Id.*

Later in June 2015, Ms. Coleman, along with twenty-five other members of the emergency management staff, attended a four-day incident management course in Alabama.  Exhibit 1 at 13.  The instructor—an individual unaffiliated with the JBSA emergency management group— removed Ms. Coleman from the course for non-participation.  *Id.*; Exhibit 12 at 125, Exhibit 11 at 67:2-6.  Ms. Coleman was subsequently charged with "conduct unbecoming" for her misconduct and received a formal notice of reprimand as a disciplinary sanction.  Exhibit 1 at 13, 20-21; Exhibit 11 at 67:2-16.

The following month, on July 7, Ms. Coleman received an email informing her that she would be called as a witness in Ms. Wilson's EEO case.  Exhibit 1 at 15; Exhibit 21.  No one else from the entire Civil Engineering Squadron was included on the notification and there is no

**Motion to Exclude Improper Prejudicial Evidence**                                                    **4**

evidence that any of her managers or colleagues were aware of the email.  Exhibit 1 at 15.  The email informed her that the investigator would start interviewing witnesses on July 20.  *Id*.  On July 20—the first day she could be called for an interview—Ms. Coleman went to the Inspector General's office and asked about filing a complaint for reprisal against Mr. Monroe.  *Id*.  She did not file any grievances or complaints at that time.  *Id*.

Two days later, Ms. Coleman approached a commanding officer and told him she was "upset and afraid; that she has no family to protect her; that she has to watch everything she does and that he (apparently Monroe) has been writing her up since June; that it was because she testified for [Ms. Wilson] and everyone at work knows what she said."  Exhibit 1 at 16.  The same day, that officer called Ms. Brenda Roesch, head of the Civil Engineering Squadron, expressed concerns that Ms. Coleman "was suicidal," and directed Ms. Roesch to meet with Ms. Coleman immediately.  Exhibit 1 at 16.  Ms. Roesch met with Ms. Coleman, who expressed concerns about her treatment and requested a transfer to a different work unit.  Exhibit 1 at 16.  Ms. Roesch granted the request and transferred Ms. Coleman out of emergency management and into the real property group effective July 27. Exhibit 1 at 16-17.  Ms. Roesch reported back to the officer, who initiated a Command Directed Investigation (the "2015 Investigation") into Ms. Coleman's claims. Exhibit 1 at 16.

The 2015 Investigation concluded in September 2015 and addressed three topics: (1) whether Mr. Monroe sexually harassed Ms. Coleman; (2) whether Ms. Coleman was subject to a hostile work environment in retaliation for her testimony against Mr. Monroe; and (3) whether Mr. Monroe engaged in unprofessional relationships with members of the emergency management group.  Exhibit 7 at 116.  The commander's report on the 2015 Investigation concluded that the claims regarding hostile work environment were not credible, finding that Ms. Coleman's

disciplinary record was based on evidence of her tardiness, unaccounted absences, the incident at the training course, and credible testimony from other employees regarding her disruptive behavior.  Exhibit 7 at 128-29.

The investigator found that the other claims were substantiated, although there were no witnesses who could corroborate any instances of misconduct against Ms. Coleman by Mr. Monroe.  *Id* at 127, 131.  The investigator overwhelmingly relied on the similarities in the stories about Mr. Monroe told by both Ms. Coleman and Ms. Wilson, although it is not clear whether the investigator knew about the friendship between the two.  *Id.*  The only neutral testimony came from a witness who stated that Mr. Monroe "was always very friendly, he hugged people, it was never just a hand-shake, he at first seemed overly-friendly to me, but I got used to seeing him greeting other people with hugs so I figured that is just how he is."  Exhibit 10.  Mr. Monroe was subsequently counseled to cease such "overly-friendly" conduct.  Exhibit 11 at 27-28.

Around November 2015, Ms. Coleman learned that management was conducting a review of the positions in the emergency management group and was considering upgrading certain positions from GS-9 to GS-11, which would result in a pay increase of approximately $10,000 per year.  Dkt 7; Exhibit 12 at 18.  On January 29, 2016, Ms. Coleman filed a step-one grievance to challenge the notice of reprimand that arose from her misconduct at the incident management course. Exhibit 1 at 20, Exhibit 13.  In her grievance, Ms. Coleman alleged that the members of the emergency management group were engaged in a "conspiratorial plan to frame me" and "further harm me via lateral transfer out of my position in CEX, at a time when those positions are being reviewed for upgrade to GS-11." Exhibit 1 at 20, Exhibit 13.  "I am grieving the attempt to frame me . . . I will not be further harmed by the corrupt actions of the CEX chain of command . . . I expect to work in a non-hostile environment and to be evaluated fairly on my work."  Exhibit

**Motion to Exclude Improper Prejudicial Evidence**                                                      **6**

13.  Included in her prayers for relief was for the arbitrator to order "disciplinary action against all managers and other personnel who abused their positions and/or made statements against me that are ultimately determined to be unsubstantiated by the commander or the arbitrator."  *Id.*

Ms. Coleman then asked Ms. Roesch to return her to the emergency management group; the request was granted effective February 2, 2016.  Exhibit 1 at 17.  Problems in the workplace immediately resumed.  Upon her return, Ms. Coleman was assigned to teaching duties.  Exhibit 1 at 17.  She had taught the courses numerous times during her tenure, as all emergency management staff are required to teach on rotation every two weeks. Exhibit 1 at 17-18.  Ms. Coleman then sent the following email to the emergency management group:

> Mr. Clark informed me this morning that I will be joining the training section and teaching the following courses: UCC, EOC and CBRN. I am sending this email to request training time, access to binders or any process in hopes of learning how to properly proctor the required courses. l also have questions to ask for example: What is the best process to become a proficient instructor in these courses? What is (sic) the training intervals for these courses? Do you have presentations, Instructor checklist or learning objective checklist, etc.? Please email me what is the best course of action to learn these courses.

Exhibit 1 at 17.

In response, Ms. Coleman had a conversation with Mr. Clark, her team lead, and Mr. Andrades, her section leader. Exhibit 1 at 17-18.  Mr. Clark told her to review the slides on the courses, which she had previously taught. Exhibit 1 at 17-18.   Immediately afterwards, Ms. Coleman sent an email to upper management, Ms. Roesch, and the union president, alleging that she had not taught the courses for "years" and that she needed to "document my request for training."  Exhibit 1 at 17.

Two weeks later, Ms. Coleman filed a police report against Mr. Monroe, alleging that he assaulted her in a hallway at Lackland AFB at 2:00pm on February 12, 2016.  Exhibit 1 at 18.  Mr. Monroe denied the allegation, stating that he had left Lackland AFB earlier that day and had been

**Motion to Exclude Improper Prejudicial Evidence**                                                    **7**

at Fort Sam Houston until 3:00pm. Exhibit 1 at 19.  Five witnesses corroborated his story.  *Id*.  Four witnesses confirmed that Mr. Monroe left Lackland AFB prior to 2:00pm and one witness confirmed that Mr. Monroe had been at Fort Sam Houston.  *Id*.  The witnesses also stated that Ms. Coleman did not appear upset and that they heard no confrontations that day. *Id*.  Mr. Monroe was not charged.  *Id*.

After filing the police report, Ms. Coleman requested another transfer.  Exhibit 1 at 19.  Ms. Roesch granted the request and transferred Ms. Coleman back to the Real Property section on February 17, 2016, consistent with agency policy mandating immediate "safety moves."  *Id*.  Ms. Roesch then wrote Ms. Coleman a letter offering her three voluntary transfer options based on her qualifications, which included the opportunity to stay with the Real Property section.  Exhibit 1 at 19-20, Exhibit 14.   Ms. Coleman selected a position with the Engineering section and was transferred effective March 23, 2016.  *Id*.

Around the same time, Ms. Coleman pressed forward with the grievance process, which continued through 2016 and ultimately resulted in an arbitration on October 17, 2016.  Exhibit 1 at 24, Exhibit 13, Exhibit 18, Exhibit 19.  Prior to the start of the arbitration hearing, however, the review of duties for existing positions and upgrading certain positions in the emergency management group from GS-9 to GS-11—the so-called promotions—was completed and new GS-11 positions were publicly posted for competitive selection in September 2016.  Exhibit 15.  Ms. Coleman did not apply for any of the jobs. Exhibit 16.

At the start of the arbitration, the parties agreed that the disputed issue would be whether management had violated federal labor law by transferring Ms. Coleman as a form of retaliation and any facts "relevant" to the claim.  Exhibit 1 at 2.  And to establish her claim, Ms. Coleman litigated the alleged conspiracy to create a hostile working environment.  Ms. Coleman argued that

**Motion to Exclude Improper Prejudicial Evidence**                                                                           **8**

she was subject to an "abusive culture" and that the agency had "hostility" and "retaliatory" intentions towards her for testifying in Ms. Wilson's case.  Exhibit 17 at 2.  To that end, Ms. Coleman stated she was subject to "revolting working conditions," attempts "by her supervisors and their agents" to "thwart her efforts to perform her work satisfactorily," and "relentless harassment" despite her "harassment complaints."  Exhibit 17 at 3, 10-11.  She further stated the harassment was "by Mr. Monroe and his supporters in the [emergency management group]." Exhibit 17 at 3.  Ms. Coleman also asserted that her new supervisors in the engineering section, "Cynthia Alguseva and Michael Arzate, and other employees are ordered to harass, ostracize and treat Ms. Coleman unfairly."  Exhibit 17 at 4.

Ms. Coleman further argued that this alleged conspiracy apparently reached the top of the chain of command.  She stated that a Colonel and Brigadier General allowed "her supervisors and others to operate with impunity to do whatever they can to punish and humiliate her for daring to object to the criminal enterprise led by Mr. Monroe and his enablers."  Exhibit 17 at 11.

In support of those claims, Ms. Coleman called two co-workers as witnesses on working conditions and her treatment in the workplace, with one witness from the engineering group and the other from the emergency management group. Exhibit 17 at 4.  She also called Mr. Monroe, who denied all allegations against him.  Exhibit 1 at 37; Exhibit 17 at 12-13.  Finally, Ms. Coleman testified.  But while she was being cross-examined, Ms. Coleman changed her story regarding her 2010-2011 dispute with Mr. Monroe — rather than sexually harassing her, Ms. Coleman testified that he sexually assaulted her. Exhibit 1 at 2.[1]  On this revelation, the arbitration was held in

---

[1] In her closing arbitration brief, Ms. Coleman changed her story again, stating that she had accused Mr. Monroe of "sexual harassment" rather than sexual assault.  Exhibit 17 at 10.

**Motion to Exclude Improper Prejudicial Evidence**                                                    **9**

abeyance so that a criminal investigation could occur.  Exhibit 1 at 2-3.  No criminal charges were brought as a result of the 2015 Investigation and the arbitration hearing concluded in March 2018.

The arbitrator consistently found that Ms. Coleman's testimony was not credible.  In response to Ms. Coleman's testimony concerning harassment and/or assault by, and the informal EEO complaints against, Mr. Monroe and Mr. Clark, the arbitrator found her testimony was "very hard to believe" and "unsupported by any documentary or other testimony."  Exhibit 1 at 36-37. The arbitrator noted that Ms. Coleman's witnesses "stated that Coleman never told them she was being harassed or assaulted and all of these witnesses stated that they believed that Coleman was a strong person who would not abide being harassed and who would have put a stop to such treatment."  Exhibit 1 at 37.  The arbitrator also rejected Ms. Coleman's reliance on the 2015 Investigation as proof that she had been sexually assaulted, stating "[a] close reading of the CDI on Coleman's allegations did not find that Monroe had sexually assault Coleman."  Exhibit 1 at 37.  The arbitrator further noted that Ms. Coleman's testimony regarding the alleged February 2016 assault by Mr. Monroe was not credible, noting it was significant that "she waited four days . . . to report it to the police," that "Coleman's testimony herein differed from her testimony to the police," and that "Coleman's statements were unsupported by any other witnesses."  Exhibit 1 at 38.

On the issue of hostile work environment, the arbitrator found that Ms. Coleman's claims were "simply too general and non-specific to be credible" and "unsupported by any documentary or corroborative testimony."  Exhibit 1 at 39.  The arbitrator did, however, highlight the testimony and written statements provided by other members of the emergency management group, who stated "their discomfort with Coleman and their description of the atmosphere they assert Coleman created in the CEX," which the arbitrator found to be "relevant and concerning." Exhibit 1 at 39.

Ms. Coleman therefore "failed to prove by a preponderance of evidence that unnamed CEX staff in any way violated or are liable" for engaging in unlawful, retaliatory workplace practices. *Id.*

Finally, the arbitrator found that the three instances in which Ms. Coleman was transferred were not retaliatory in nature, noting the instances in which Coleman voluntarily requested and agreed to the transfers. Exhibit 1 at 40-43. Importantly, the arbitrator found Ms. Coleman's testimony concerning alleged retaliation not credible because of the lack of evidence showing that staff were aware of her testimony, specifically finding it "extremely surprising" that the investigator "would reveal it to anyone in the middle of an ongoing investigation." Exhibit 1 at 41. The arbitrator also noted that there was no evidence showing that Ms. Roesch had any knowledge of Ms. Coleman's testimony in Ms. Wilson's EEO case until Ms. Coleman told her about it in a November 2015 email responding to her proposed suspension. Exhibit 1 at 41.

The arbitrator subsequently denied the grievance and dismissed it in its entirety. Exhibit 1 at 44. Ms. Coleman remains detailed at the engineering group.

## Procedural History

The Scheduling Order, Dkt. 32, in this case established the following deadlines:

- Close of Fact Discovery — July 19, 2019

- Plaintiff's Deadline for Designating Testifying Experts — October 22, 2019

- Defendant's Deadline for Designating Testifying Experts — November 5, 2019

- Close of Expert Discovery — December 13, 2019

Ms. Coleman deposed fact witnesses Ms. Brenda Roesch, Mr. Michael Arzate, and Ms. Cristin Babb, as a 30(b)(6) representative for the Air Force. At both Ms. Roesch and Ms. Babb's depositions, Ms. Coleman spent a significant portion of the time asking the witnesses about the allegations of sexual harassment against Mr. Monroe, the procedures governing reports of sexual

harassment, how the Air Force handled the claims against Mr. Monroe, and asking the deponents to read statements from the CDI and other documents not prepared by them into the record.  Exhibit 22.  The government deposed only Ms. Coleman.

Finally, in addition to the court-ordered deadlines above, the parties had agreed to mediate the case on November 7.  But Ms. Coleman cancelled the mediation on November 4, without any explanation as to why other than a bald assertion of bad faith.  Dkt. 36 (Defendant's November 5 Advisory to the Court).  On November 13, however, Ms. Coleman's union representative sent a letter to head of the civil engineering group at JBSA entitled "corruption and the need for moral leadership" that appears to explain why the mediation was cancelled.  Exhibit 20.  In this letter, the union representative states that (a) she has heard "rumors" that the remaining emergency management positions would be upgraded to GS-11 and (b) she believed the Air Force would insist on requiring a non-disclosure agreement as part of any settlement agreement.  Both claims are totally unfounded, but the latter is particularly egregious.  Under 28 C.F.R. § 50.23, the Justice Department could not execute a settlement agreement in this case if it contained a confidentiality provision.

## Argument

I.     **The Court should prohibit Ms. Coleman from raising, referring to, or introducing evidence concerning allegations of sexual harassment or assault against Mr. Monroe, any conspiracy by Air Force officials, and all other matters that were subject to her negotiated grievance and arbitration proceedings.**

A.     **5 U.S.C. § 7121(d) and 29 C.F.R. § 1614.301(a) preclude Ms. Coleman from referencing any matters that she raised in her negotiated grievance and arbitration proceedings.**

A unionized federal employee who asserts an employment discrimination claim is subject to a statutory election of remedies procedure.  Under 5 U.S.C. § 7121(d), federal employees may raise a "matter under a statutory procedure or the negotiated procedure, but not both."  Under the

implementing regulations with respect to discrimination claims, an employee that "is covered by a collective bargaining agreement that permits allegations of discrimination to be raised in a negotiated grievance procedure . . . must elect to raise the matter under either [federal EEOC procedures] or the negotiated grievance procedure, but not both."  29 C.F.R. § 1614.301(a).  "An aggrieved employee who files a grievance with an agency . . . may not thereafter file a complaint on the same matter" under EEOC procedures.  *Id.*  "Any such complaint filed after a grievance has been filed on the same matter shall be dismissed without prejudice to the complainant's right to proceed through the negotiated grievance procedure including the right to appeal to the Commission from a final decision."  *Id.*  An employee's election of the statutory procedure or the grievance procedure is "irrevocable."  *Maddox v. Runyon*, 139 F.3d 1017, 1021 (5th Cir. 1998).

The term "matter" refers to the underlying conduct and circumstances that gives rise to the grievance or complaint.  When evaluating whether a grievance and complaint encompass the same matter, courts have consistently applied what is known as the *Facha/Bonner* analysis: "If the employee raised a topic in both documents, or if the arbitrators assigned to handle the grievance would necessarily have needed to inquire into a topic in discharging their duties, then section 7121(d) bars her from raising that same topic in her subsequent EEO complaint."  *Guerra v. Cuomo*, 176 F.3d 547, 550 (D.C. Cir. 1999) (citing *Bonner v. Merit Sys. Prot. Bd.*, 781 F.2d 202, 204-05 (Fed. Cir. 1986) and *Facha v. Cisneros*, 914 F. Supp. 1142, 1148 (E.D. Pa. 1996)).

The term "matter" is also understood "to encompass more than a legal claim" and includes "an employer's action with effects over an extended period of time or separate actions, on a different day, by a different decision maker."  *Id.* (internal quotation marks and citations omitted). This construction is consistent with the plain meaning of the term, which is defined as "An event, circumstance, fact, question, state or course of things, etc., which is or may be an object of

consideration or practical concern; a subject, an affair, a business."  *Matter*, Oxford English Dictionary (3d ed. 2001).

Finally, the scope of what constitutes a "matter" is not limited by the legal claims asserted in the grievance procedure.  For example, in *Linthecome v. O'Neill*, 45 F. App'x 323, 2002 WL 1860532 (5th Cir. June 27, 2002), the Fifth Circuit rejected the proposition that an employee can bring a discrimination complaint in district court "because he had not mentioned age, sex, or race in his formal CBA grievance."  *Id.* at *2; *see, e.g.*, *Taylor v. Dam*, 244 F. Supp. 2d 747 (S.D. Tex. 2003) (following *Linthecome*, *Facha*, and *Bonner*).

One particularly pertinent authority on this issue is *Rosell v. Wood*, 357 F. Supp. 2d 123 (D.D.C. 2004), in which the district court applied the *Facha/Bonner* analysis to dismiss claims based on facts that are substantially similar to those in this case.  In *Rosell*, the plaintiff brought a grievance alleging that his supervisor was retaliating against him for having filed a previous lawsuit regarding overtime pay by (i) allegedly engaging in ongoing hostile conduct, (ii) placing a written warning in his file based on fabricated instances poor work performance, and (iii) imposing leave restrictions.  *Id.* at 125.  The plaintiff subsequently filed a complaint asserting claims for discrimination based upon the same circumstances raised in the grievance.  *Id.*  The district court dismissed the plaintiff's claims, reasoning "[a]lthough Rosell's grievance and complaint present different legal theories, they are rooted in the same factual nucleus, and therefore, concern the same matter."  *Id.* at 131.

So too here.  Ms. Coleman's January 2016 grievance alleged that she was suffering harassment and abuse in retaliation for testifying in Ms. Wilson's EEO case. Exhibit 13.  She further substantiated allegations throughout the grievance process. Exhibit 18; Exhibit 19. Notably, Ms. Coleman does not dispute that the matters raised through the grievance process are

the same matters raised here to support her retaliatory hostile work environment claims.  Exhibit 3 at 286: 16-25.  Furthermore, to avoid any doubt about the matters addressed through the grievance process, the record shows the matters Ms. Coleman raised through the grievance process and presented at the arbitration are the same as those now raised in the complaint:

| Matters Alleged | Grievance/Arbitration | Amended Complaint |
| --- | --- | --- |
| Harassment by Emergency Management Staff | Exhibit 13; Exhibit 18; Exhibit 17 at 5, 10, 14 | Paragraphs 17-23, 32 |
| Fabricated Reprimands | Exhibit 13; Exhibit 18; Exhibit 17 at 2, 5, 7, 10, 15 | Paragraphs 26, 27, 29 |
| Work Section Transfers | Exhibit 17 at 7, 11 14-15; Exhibit 13 | Paragraphs 25, 31, 34, 35 |
| Failure to Document Transfers | Exhibit 17 at 2, 6, 11, 13 | Paragraphs 35 |
| Sexual Harassment or assault by Mr. Monroe | Exhibit 17 at 2, 4, 12; Exhibit 18; Exhibit 19 | Paragraphs 7-10, 24 |
| Physical Assault by Mr. Monroe | Exhibit 17 at 5, 9-10 | Paragraphs 33 |
| Ongoing Harassment by Engineering Staff | Exhibit 17 at 6, 9, 10, 11, 14. | Paragraphs 37-41 |
| Conspiracy | Exhibit 13; Exhibit 18; Exhibit 17 at 11, 17 | Paragraphs 16, 48-50 |

By raising those matters in the grievance process, Ms. Coleman "irrevocably" committed resolution of any related facts or circumstances to the grievance process.  *Maddox*, 139 F.3d at 1021; *Taylor*, 244 F. Supp. 2d at 760.  As a result, "section 7121(d) bars her from raising" the same matters in her subsequent complaint.  *Guerra*, 176 F.3d at 550.  Similarly, as Ms. Coleman is barred from asserting any right to relief based on those matters, the admission of such facts would be impermissible under Fed. R. Evid. 401.

**B.**     **Ms. Coleman's conduct in this case demonstrates a significant risk that she will raise accusations of sexual harassment, sexual assault, and conspiracy to harass and defame Air Force officials, unfairly prejudice the government, and confuse jurors.**

Although evidence of extraneous bad acts may be admissible for purposes such as establishing motive, opportunity, or intent under Fed. R. Evid. 404(b), such evidence still may be excluded under Fed. R. Evid. 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *United States v. Beechum,* 582 F.2d 898, 916-17 (5th Cir. 1993); *Manthos v. Jefferson Parish*, 353 F. App'x 914, 920 (5th Cir. 2009).   Factors that the Court should consider in weighing the evidence include the incremental probative value of the evidence, the likelihood that the prior bad act was in fact committed, the closeness in time between the prior acts and the current act, the similarity of the prior act to the current act, the availability of other methods of proof, and the risk that the evidence will have an emotional impact on the factfinder.  *Id.*

The Fifth Circuit has consistently affirmed decisions excluding evidence that allegedly goes to generalized issues of low probative value such as motive, knowledge, or opportunity, but the "true reason for seeking to introduce the evidence was to paint [the opposing party] as a 'bad' company." *Compaq Computer Corp. v. Ergonome Inc.*, 387 F.3d 403, 409 (5th Cir. 2004).  *See also Manthos*, 353 F. App'x at 920 (affirming exclusion of newspaper articles related to a manager's prior job performance that were offered as relevant to the manager's motives for termination); *Graniczny v. City of El Paso*, 809 F. Supp. 2d 597, 605-06 (W.D. Tex. 2011).  The Fifth Circuit has also noted the particular danger of prejudice, confusion, and delay relating to evidence of incidences of sexual harassment "remote in time and place" to claims immediately at

issue.  *See Southard v. Texas Bd. of Crim. Justice*, 159 F.3d 1356, 1998 WL 698995 (5th Cir. 1998) (unreported).

Here, Ms. Coleman's only actionable claim is for retaliatory hostile work environment "in reprisal for giving testimony to the EEO Investigator concerning Ms. Wilson's EEO case."  Dkt. 23 at 5 (quoting Amended Compl. ¶18), 22 (dismissing failure to train and failure to promote claims).  Specifically, as this Court noted, "the two allegations accepted by the EEOC concern plaintiff's claims for retaliatory reprisal for her prior EEO activity on two separate occasions: when she was transferred to exclude her from duties, awards, and subsequent promotions, and to ensure she was not adequately trained in her current position."  *Id.* at 17 (internal quotation marks omitted).  And for the reasons set forth above, under 5 U.S.C. § 7121(d) the entirety of the former allegation is precluded and, to the extent any actionable basis for the latter remains, it would be limited to facts and circumstances that were not raised in the grievance and arbitration process.[2] Accordingly, the only issue that the history of the accusations against Mr. Monroe and the Air Force could potentially be relevant to is whether Mr. Arzate has acted with retaliatory intent.  *See Feist v. La. Dep't of Justice, Office of the Atty' Gen.*, 730 F.3d 450, 454-55 (5th Cir. 2013) (discussing causation in retaliation cases).

Ms. Coleman's apparent intent to raise issues concerning sexual harassment, sexual assault, and a conspiracy theory alleging a widespread government cover-up seems aimed at inflaming emotions, distracting from the core issues in the case, and encouraging the factfinder to render a decision on an improper basis.  The probative value of those issues is non-existent, or at best minimal — those facts and circumstances do not establish that Mr. Arzate has acted with intent to

---

[2] This statement should not be construed as an admission that Ms. Coleman's retaliation claim has any merit.

retaliate against Ms. Coleman for participating in Ms. Wilson's EEO case, that he acted at the direction of someone with such retaliatory intent, or that he even had knowledge of any issues that could cause him to act with such retaliatory intent.  Ms. Coleman could have explored those issues through discovery to a greater degree, but chose not to do so.

The strength of the accusations is also very weak.  There are no eyewitnesses or documents that directly support her claims.  The arbitrator found that Ms. Coleman's testimony at the arbitration hearing was not credible.  And the narrow finding in the 2015 Investigation concerning inappropriate gift giving and inappropriately hugging or touching with respect to Ms. Coleman in no way corroborates her far more severe claims of sexual harassment and sexual assault, including the flat accusations of rape at her deposition.  Exhibit 3 at 92: 7, 22-23; 111: 7-8; 118: 23-24.  In addition, the six-year gap between when those claims occurred and Ms. Coleman's treatment in the engineering section is so distant in time as to weigh in favor of exclusion.

Finally, the extreme nature of these accusations present a significant and substantial risk of having an inappropriate emotional impact.  Simple accusations of a prior incident of sexual misconduct can be particularly stigmatizing.  And Ms. Coleman's ever-growing, yet unsupported accusations of misconduct against Mr. Monroe and a vast government conspiracy to protect him appear structured to (a) maximize emotional impact and stigmatization and (b) encourage a decision on an improper basis.  For example, the November 13, 2019, letter from Ms. Coleman's union representative now implies that Air Force leadership is complicit in enabling sexual assault and responsible for causing suicides within the workforce.

In summary, all of the *Beechum* factors weigh against admission.  Any evidence relating to Ms. Coleman's claims of sexual assault and sexual harassment against Mr. Monroe are of low probative value.  There is a significant likelihood that the allegations are false.  There is a six-year

gap between when the alleged conduct occurred and Ms. Coleman's mistreatment in the engineering section.  Ms. Coleman's complaints that Mr. Arzate is not treating her fairly in the workplace is nothing like her allegations of sexual harassment and sexual assault against Mr. Monroe.  And there is a significant and substantial risk that such allegations will have an unfairly prejudicial emotional impact on the factfinder.

### Conclusion

For these reasons, the government respectfully requests that the Court grant the motion to exclude and grant any further relief to which the government may be entitled.

Dated: December 5, 2019

Respectfully submitted,

John F. Bash
United States Attorney

By:   */s/ Noah M. Schottenstein*
Noah M. Schottenstein
Assistant United States Attorney
Texas Bar No. 24100661
601 N.W. Loop 410, Suite 600
San Antonio, Texas  78216
(210) 384-7392 (phone)
(210) 384-7312 (fax)
noah.schottenstein@usdoj.gov
Attorneys for Defendant

### Certificate of Conference

I hereby certify the conference required under LR CV-7(i) was conducted via email on December 5, 2019.  Plaintiff did not respond to the email sent by undersigned counsel.

*/s/ Noah M. Schottenstein*
Noah M. Schottenstein
Assistant United States Attorney

**Motion to Exclude Improper Prejudicial Evidence**                                                    **19**

**Certificate of Service**

I certify that on December 5, 2019, I electronically filed this document with the Clerk of Court using the CM/ECF system.

☒   The CM/ECF system will send notification to the following CM/ECF participant(s):

Ricardo A. Garcia-Tagle (ricardo@ragarcialaw.com)

*/s/ Noah M. Schottenstein*
Noah M. Schottenstein
Assistant United States Attorney

**Motion to Exclude Improper Prejudicial Evidence**                                    **20**

United States District Court
Western District of Texas
San Antonio Division

| | | |
|---|---|---|
| Valentia Coleman,<br>        Plaintiff, | | |
| | | |
|         v. | | No. SA-17-CV-00819-FB |
| | | |
| Heather Wilson, Secretary of the Department<br>of the Air Force,<br>        Defendant. | | |

**Order Granting Defendant's Motion to Exclude Improper Prejudicial Evidence**

Before the Court is Defendant's Motion to Exclude Improper Prejudicial Evidence, filed

December 5, 2019.  The Court finds that the motion has merit and should be granted.

Accordingly, IT IS HEREBY ORDERED that Defendant's Motion to Exclude Improper

Prejudicial Evidence is GRANTED.  IT IS FURTHER ORDERED that Plaintiff may not, in any

motions or other proceedings in this case, raise, refer to, or introduce evidence concerning all

matters that we subject to her negotiated grievance and arbitration proceedings under 5 U.S.C.

§ 7121(d), including, but not limited to, any allegations of sexual harassment or assault against

Mr. Monroe and any conspiracy by Air Force officials.


It is so **ORDERED**.

Signed this _____ day of _____, 2019


_____
**HONORABLE FRED BIERY**
SENIOR U.S. DISTRICT JUDGE