IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| VALENTIA COLEMAN § | |
| § | Case Number 5:17-cv-00819-FB |
| Vs. § | |
| § | |
| SECETARY OF THE DEPARTMENT OF § | |
| THE AIR FORCE, HEATHER WILSON § | |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

NOW COMES the Plaintiff, VALENTIA COLEMAN, by and through her attorney of record, and moves this honorable Court, pursuant to Federal Rule of Civil Procedure 56, for Summary Judgment in favor of Plaintiff and against Defendant on Plaintiff's claim. In support of this motion, Plaintiff states as follows:

1. Plaintiff has a claim of retaliatory hostile work environment against Defendant under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

2. Plaintiff is entitled to summary judgment because there is no genuine issue of material fact thus Plaintiff is entitled to judgment as a matter of law. Specifically, Ms. Coleman can prove that she (1) engaged in protected activity; (2) was subjected to harassment; (3) there was a causal connection between the protected activity and the harassment; and (4) the harassment affected a term, condition, or privilege of employment.

**I.      LEGAL STANDARD FOR A MOTION FOR SUMMARY JUDGMENT**

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); See *Celotex Corp. v Catrett,* 477 U.S. 317, 323-234 (1986). "A movant is entitled to summary judgment when the evidence is such that a reasonable jury, drawing all reasonable inferences in the non-movant's favor, could not return a verdict for the non-movant" *Camarda v. Certified Fin. Planner Bd. of Stds., Inc.,* 672 Fed. Appx. 28, 2016 U.S. App. LEXIS 18061. A plaintiff moving for summary judgment satisfies its burden by submitting to the court summary judgment proof that establishes

1

all elements of its cause if action as a matter of law. *See San Pedro v. United States*, 79 F.3d 1065, 1068 (11th Cir. 1996).

## II. BACKGROUND

### A. Ms. Coleman is hired and is targeted by Willie Monroe

In 2004, Plaintiff Coleman (hereinafter "Ms. Coleman") enlisted with the Air Force and attended technical school for training in Emergency Management. In 2005, Ms. Coleman graduated with distinction and began her career as an Emergency Flight Specialist in the Civil Engineering Squadron at Robbins AFB, Georgia. In March 2008, after a successful career as an Emergency Manager, Ms. Coleman was honorably discharged from the Air Force.

In late 2009, as an Air Force Reservist, Ms. Coleman applied for a General Schedule (GS) Readiness Program Specialist position with the federal government. In early 2010, Willie Monroe, Flight Chief for the 502nd Civil Engineer Group Emergency Management (hereinafter "Mr. Monroe"), and two other individuals interviewed Ms. Coleman via telephone for an Emergency Management Specialist position located at Randolph AFB, Texas (hereinafter "Randolph").

In February 2010, Mr. Monroe, the position hiring official, offered Ms. Coleman the Emergency Management Specialist position. In February 2010, Ms. Coleman accepted the position offered, an Occupational Code 301 series, Grade 9, Step 1 with the Civil Engineering Emergency Management Flight (hereinafter "CEX") at Randolph. Shortly after reporting for work at Randolph, Mr. Monroe targeted and sexually assaulted Ms. Coleman at work. Mr. Monroe told Ms. Coleman that he could fire her if she reported the sexual assault since she was a probationary employee at that time. Mr. Monroe made sure that there were no witnesses to the sexual assault. Mr. Monroe believed he could coerce Ms. Coleman to keep quiet since she was a

single mother who needed to work.  Mr. Monroe sexually assaulted Ms. Coleman on several more occasions.

In late 2010, while still probation, Ms. Coleman, Ms. Coleman made an anonymous complaint to the EEO Office. The EEO Office informed Richard Treviño, the highest-ranking civilian leader at Randolph (hereinafter "Mr. Treviño) of Ms. Coleman's complaint. Mr. Treviño confronted Ms. Coleman about her complaint, and she told him about being sexually assaulted by Mr. Monroe. Mr. Treviño claimed to have investigated Ms. Coleman's complaint. However, neither the EEO Office nor Mr. Treviño told the proper authorities about the sexual assault and instead Mr. Treviño informally detailed Ms. Coleman to a Security Officer position under a delusional notion that the detail would provide Ms. Coleman with a solution. Mr. Monroe was not reported, investigated or disciplined for his acts but instead was subsequently promoted. *See Declaration of V. Coleman, Exhibit 1.*

In her deposition, Cristen Babb, (hereinafter "Ms. Babb") Defendant's designated 30(b)(6) witness, confirmed the EEO report filed by Ms. Coleman in 2010.

- Q. (By: Mr. Garcia-Tagle) Okay. In 2010, you've agreed that Ms. Coleman did go to the EEO office to complain about Mr. Monroe, correct?
- A. (By: Ms. Babb) Yes.
- Q.· And I asked you also to confirm the allegations made by Ms. Coleman that included a claim of sexual harassment and sexual assault. Can you confirm that?
- A.· Yes.
- Q.· Okay. ·And what was the outcome of that 2010 complaint?
- A.· My understanding at the time, there was no action taken in 2010.
- Q.· Ms. Babb, do you know why no action was taken?
- A.· I do not.

*C. Baab, deposition transcript, Exhibit 2, pg. 16.*

As a result of Ms. Coleman's complaint to the EEO Office and Mr. Treviño's investigation, Mr. Monroe and his enablers began a program of harassment and intimidation against Ms.

3

Coleman.[1] The harassment against Ms. Coleman included unjustified discipline, intimidation and fear. *See Exhibit 1, ¶7, 9.* In 2013, after Ms. Coleman's probationary period had expired, she again sought the help of the EEO Office and filed a complaint against Willie Monroe. However, Ms. Coleman did not pursue the complaint because she feared further inaction by the Air Force and increased hostility and retaliation. *See Id. at ¶¶8, 10-12.*

### B. Sasha Wilson is hired and sexually assaulted by Mr. Monroe

In February 2014, Mr. Monroe hired Sasha Wilson (hereinafter "Ms. Wilson") as a Secretary. In 2015, Ms. Wilson, after her probationary status had ended, filed a sexual harassment complaint with the EEO Office against Mr. Monroe. In her complaint, Ms. Wilson made similar allegation to those made by Ms. Coleman in 2010 and 2013. In her deposition, Ms. Babb confirmed Ms. Wilson's EEO complaint and its similarities with Ms. Coleman's previous allegations. In her complaint against Mr. Monroe, Ms. Wilson named Ms. Coleman as a witness. *See Exhibit 10.*

> Q.·(By Mr. Garcia-Tagle)· Do you recall if Ms. Coleman and Ms. Wilson both alleged that they were forced to have sex with Mr. Monroe because they felt they had no option to refuse Mr. Monroe?
> A. (By Ms. Babb) Yes.
> Q. Do you recall what both Ms. Wilson and Ms. Coleman alleged they felt about being coerced and why they felt coerced?
>     Mr. Schottenstein:· Objection; form
> Q.· By Mr. Garcia-Tagle)· Ms. Babb, do you need me to rephrase?
> A.· Please.
> Q.· Okay.· Did both Ms. Coleman and Ms. Wilson state that they were coerced into having sex with Mr. Monroe because Mr. Monroe expressed to them that he could fire them because they were on probation, if they didn't agree to do what he wanted?

---

[1] A review of countless allegations of sexual abuse the military reveals a similar pattern by military, i.e., deny and protect the abuser/sexual predator and initiate a plan of re-victimization and retaliation against the complainant. *See Protectourdefenders.com.* Employees like Ms. Coleman and Vanessa Guillen and countless others are harassed and assaulted by their superiors but are afraid to complain because of the military's horrendous record of inaction, retaliation or worse, as was the case for Ms. Guillen.

> A.· Yes.
>> *C. Baab, deposition transcript, Exhibit 2, pg. 42.*

### C. **Ms. Coleman is named as a witness and is required to give a statement**

In the morning of March 30, 2015, Ms. Coleman gave a verbal statement to the EEO Investigator in Ms. Wilson's EEO case against Mr. Monroe. In her deposition, Ms. Babb confirmed that Ms. Coleman made a statement to the EEO Investigator. *See Exhibit 1, ¶14.*

> Q.  (By Mr. Garcia-Tagle) Ms. Babb, do you recall that Ms. Coleman, on or about 30 March 2015, gave a telephonic statement to the EEO regarding Sasha Wilson's complaint against Mr. Monroe?
> A.· (By Ms. Babb) Yes.
>> *C. Baab, deposition transcript, Exhibit 2, pg. 42.*

In the afternoon of March 30, 2015, Mr. Monroe and his cronies intensified their hostilities against Ms. Coleman. *See Exhibit 1, ¶¶15-18.* On September 16, 2015 Ms. Coleman gave a written statement to the EEO Investigator in Ms. Wilson's EEO case. Mr. Monroe and his enablers continued to harass and retaliate against Ms. Coleman. On June 18, 2015, Ms. Coleman again filed a complaint with the EEO office to report the hostility she was suffering. *See Exhibit 1.* In her deposition, Ms. Babb confirmed Ms. Coleman's contact with the EEO Office in 2015.

> Q. (By Mr. Garcia-Tagle) Ms. Babb, do you recall that on or about 18 June 2015, Ms. Coleman again contacted the EEO office and complained of retaliation?
> A   (By Ms. Babb) Yes.
> Q.· What do you recall of that contact --Ms. Coleman's contact to the EEO office?
> A.· I don't know the specifics.
>> *C. Baab, deposition transcript, Exhibit 2, pg. 41.*

On July 21, 2015, Ms. Coleman complained to Colonel Alexander Smith, 502nd Wing Commander, (hereinafter "Col. Smith") about the relentless hostility she was suffering. In her deposition, Ms. Babb confirmed Ms. Colman's complaint.

> Q. (By Mr. Garcia-Tagle) Ms. Babb, do you recall that on or about July 21st, 2015, Ms. Coleman spoke to Colonel Alexander Smith about hostile work environment?

5

> A.  (By Ms. Babb) Yes.
> Q.· What do you recall about that conversation Ms. Coleman had with Mr. Smith -- I'm sorry, Colonel Smith?
> A.· I don't know the specifics of the conversation.
> Q.· Do you recall any generalities about the conversation Ms. Coleman had with Colonel Smith?
> A.· That the workplace was hostile as a result of her testifying for -- in Ms. -- her name is escaping me -- Sasha Wilson -- in Ms. Sasha Wilson's complaint.
>
> *C. Baab, deposition transcript, Exhibit 2, pg. 47.*

Immediately after returning from complaining to Col. Smith, Mr. Monroe and his cronies charged Ms. Coleman with AWOL. In her deposition, Ms. Babb acknowledged the discipline charged against Ms. Coleman.

> Q.· (By Mr. Garcia-Tagle) Okay.· Do you recall that on that same date, 21 July 2015, Ms. Coleman was given a 971 alleging that she had four hours of AWOL for July 6 and July 13?
> A.· I believe it was in the morning.· And she was late for work without a call, without following whatever the procedures were in that office.
> Q.· Do you recall any other details with regard to that 971?
> A.· No
> A.· (By Ms. Baab) Yes.
>
> *C. Baab, deposition transcript, Exhibit 2, pgs. 47-48.*

 The AWOL claim against Ms. Coleman was in retaliation for her complaining to Col. Smith. The AWOL claim against Ms. Coleman was eventually dropped. *See Exhibit 1, ¶15.*

As a result of Ms. Coleman's complaint, Col. Smith ordered a Commander Directed Investigation (hereinafter "CDI") into the allegations of hostility made by Ms. Coleman.

> Q.·(By Mr. Garcia-Tagle)· Ms. Babb, do you recall if a commander directed investigation was ordered as a result of Ms. Coleman's complaint to Colonel Smith about a hostile work environment?
> A. (By Ms. Babb) Yes.
> Q.· Okay.· Do you recall if Ms. Coleman expressed that she had been the victim of a sexual assault at -- at this time?
> A.· ·Yes.
>
> *C. Baab, deposition transcript, Exhibit 2, pgs. 51-52.*

6

**D. Coronel Alexander Smith orders an Investigation into Ms. Coleman's allegations**

After, receiving the complaint from Ms. Coleman, Col. Smith ordered a Commander Director Investigation (hereinafter "CDI") into the facts of sexual assault, harassment and abuse. Col. Smith immediately removed Ms. Coleman from working for Mr. Monroe and detailed Ms. Coleman to work in Asset Management Real Property (hereinafter "CEA"). Col. Smith ordered Brenda Roesch, (hereinafter "Ms. Roesch"), the 502nd Deputy Base Civil Engineer, to oversee the allegations made by Ms. Coleman.

Shortly after July 21, 2015, Ms. Roesch met with Ms. Coleman and Eloise Stripling, President of AFGE Local, 1367 to discuss the allegations. In her deposition, Ms. Roesch acknowledged the substance of Ms. Coleman's allegations.

> Q. (By Mr. Garcia-Tagle) Okay.· And what did you and Ms. Coleman speak about?
> A. (By Ms. Roesch)·· We went to Ms. Stripling's office to have the meeting. She was kind enough to let us use it privately, and she spent approximately an hour and a half to two hours going through allegations against Mr. Monroe and his staff of harassment and misconduct that -- and she was distraught, and it was over a period of time.· Some of her discussions began well before Joint Base even.· It began in her time at Randolph, when Mr. Monroe hired her.
> Q.· Did --
> A.· She -- she went that far back and then – and discussed up to the -- to that present moment.
> Q.· Okay.· And did she discuss -- did she discuss being sexually assaulted by Mr. Monroe?
> A.· She didn't mention assault at that moment, but a --harassment for sure, and misconduct by him and his – his subordinate staff, disparate treatment.· Because she wouldn't --you know, he was pressuring her in her allegations.· So – and she had told me, because she wouldn't cooperate, she was being harassed by him and his subordinates, was her allegation.
>
> *B. Roesch deposition transcript, Exhibit 3, pgs. 9-10.*

On or about July 27, 2015, Ms. Roesch appointed Grace Cormier-Johnson as the Investigating Officer to lead the CDI.   However, instead of investigating the serious allegation of sexual assault committed by Mr. Monroe, Ms. Cormier-Johnson limited the investigation to include three (3) claims against Mr. Monroe. The three claims were:

7

1) sexual harassment, (2) creating a hostile work environment, and (3) unprofessional relationships. *See CDI Report and Findings*, Exhibit 4.

On October 30, 2015, Ms. Cormier-Johnson issued her findings. In keeping with Defendant's *modus operandi*, Ms. Babb, in her deposition, claimed that she did not know the findings of the CDI.

> ·Q.·(By Mr. Garcia-Tagle)· Yes, ma'am.· So we're talking about a commander-directed investigation, something I've been calling also a CDI, as a result of Ms. Coleman complaining to Colonel Smith about a hostile work environment.· On July 27, 2015, Lieutenant Colonel McElhaney appointed Grace Cormier-Johnson to perform that CDI.· Do you recall what the findings were of that CDI?
> A.· (By Ms. Baab) No.
>
> *C. Baab, deposition transcript, Exhibit 2, pg. 50.*

Fortunately, the CDI speaks for itself and it confirmed two (2) serious acts of misconduct. In the report, Ms. Cormier-Johnson substantiated the following allegations:

> "Between on or about 1 July 2010 and or about 24 July 2015, Mr. Willie Monroe 502d Civil Engineering Squadron JB-SA- Lackland, Texas **did engage** in harassment of Ms. Valentia Coleman, in violation of AFI-36-2806, Equal Opportunity Program Military and Civilian, paragraph 1.1, by committing unwelcome sexual advances and engaging in other conduct of sexual nature, including but not limited to the conduct outlined in the NDAA Informal Sexual Harassment Complaint Reporting memorandum from 502 ABW/EO, dated June 2014." (Emphasis supplied) and

> "Between on or about 1 July 2010 and or about 24 July 2015, Mr. Willie Monroe 502d Civil Engineering Squadron JB-SA- Lackland, Texas **did engage** in unprofessional relationships, to wit: adulterous relationships with members of the squadron in violation of AFI-1-,paragraphs 2.1 and 2.2. (Emphasis supplied) *See Exhibit 4, CDI Report and Findings.*

In sum, the investigation concluded Mr. Monroe "*committed unwelcome sexual advances and engag[ed] in other conduct of sexual nature*, which amounted to an "*adulterous relationship*". An unwelcome sexual advance that is an adulterous one, i.e., sexual, is a sexual assault. In this case, the sexual assault by Mr. Monroe on a subordinate, Ms. Coleman.

The findings that concluded that Mr. Monroe committed what amounted to a <u>crime</u> should have resulted in his immediate removal from employment, subsequent arrest and prosecution. It

8

also should have been vindication for Ms. Coleman and an end to more than five (5) years of relentless hostility against her.

Unfortunately, Ms. Roesch refused to discipline Mr. Monroe and confirmed that Mr. Monroe was not investigated, arrested, prosecuted or even internally disciplined.

> Q. (By Mr. Garcia-Tagle)  Do you recall discussing this substantiated allegation against Mr. Monroe with Colonel Smith?
> A.  (By Ms. Roesch) Yes.
> Q.  Okay.· And what did you discuss?
> A. The appropriate policy application of the Douglas factors and table of penalties for management action.
> Q. Okay.· So you were trying to determine whether or -- and how much to discipline Mr. Monroe for this action; correct?
> A. Correct.
> Q. Okay.· And what did you determine?
> A. With Colonel Smith's guidance, HR's guidance and Phil Jimenez -- Mr. Felipe Jimenez, the GSF team at the airbase wing, because they were the ones who spoke with the investigator, not me.· I just read the report; they -- I also spoke with the investigator -- and with HR's guidance, they said, according to the Douglas factors and the table-of-penalties policy, **that an oral counseling was appropriate for management action. That committing unwelcome sexual advances and engaging in other conduct of a sexual nature, that that deserved a verbal counseling.· Is that what you said?[2]**
> A. Yes.
> Q. And who made that final determination?
> A. I did, under the guidance of the policy and Colonel --and guidance from my airbase wing, chain of command, HR and group command. (Emphasis supplied)
> 
> *B. Roesch deposition transcript, Exhibit 3, pgs. 27-28; 70-72.*

In her deposition, Ms. Roesch also claimed that a verbal counseling was the proper amount of discipline for Mr. Monroe after considering Mr. Monroe's inappropriate acts with Ms. Wilson and relying on the Air Force's "zero tolerance" policies concerning interactions between supervisor and subordinates. *See Exhibit 3, pgs, 40-42; 70-72.*

Moreover, and just as egregious, Ms. Roesch and Defendant refused to tell Ms. Coleman the findings of the CDI.  Ms. Roesch led Ms. Coleman to believe that the CDI had not shown

---

[2] An oral counseling is <u>not</u> considered discipline. According to Ms. Roesch, Mr. Monroe received only one (1) verbal counseling for all the findings, violations and improper acts committed by Mr. Monroe.

9

any wrongdoing and in early 2016, returned Ms. Coleman to the CEX to work for Mr. Monroe.

*See* Exhibit 1, ¶19.

> Q. (By Mr. Garcia-Tagle) Okay. Who had the obligation to tell Ms. Coleman that a CDI had come back with a finding – with two findings --substantiated findings.
> A. (By Ms. Roesch) I am unaware that a commander owes an employee follow up on his investigation. It's his investigation for his purposes. I do not recall if he has any obligation to do so, to follow up.
> Q. Do you recall if Ms. Coleman requested from you a copy of the findings.
> A. She did.
> Q. -- from the CDI?
> A. She did. I do recall that –
> Q. Okay.
> A. -- and she -- and I was advised that she needed to do it through a FOIA -
> Q. Okay.
> A. --. so that certain things could be redacted that might be Privacy Act information.
> Q. So you did not provide Ms. Coleman with a copy of the CDI?
> A. No. I directed her to the FOIA process that I was told was the correct way for her to -- so that the appropriate procedures could be done before it was provided to her.
> Q. Okay. Did you tell Ms. Coleman, verbally, the findings of the CDI?
> A. No.
>
> *B. Roesch deposition transcript, Exhibit 3, pgs. 53-54.*

It was clear, that Ms. Roesch and Defendant were more concerned with hiding the evidence that concluded that Mr. Monroe was a sexual predator than protecting a victim of sexual assault and harassment.

> Q. (By Mr. Garcia-Tagle) But important for Ms. Coleman to know that there was a finding in the CDI.
> A. (By Ms. Roesch) I think it's important to protect the privacy of all individuals involved.
> Q. You were protecting Mr. Monroe; correct?
> A. All individuals –
> Q. You were also --
> A. -- all employees. All employees. It is my job to protect the rights of all of the employees.
> Q. But specific --
> A. All of them.
> Q. But, specifically, you were protecting Mr. Monroe.
> A. No.
> Q. Was Mr. Monroe -- is he considered an employee?
> A. Yes.
> Q. Okay. So you were protecting Mr. Monroe also.
> A. I was protecting everyone equally.

10

> Q. Including Mr. Monroe.
> A. Yes.
> Q. And what were you protecting Mr. Monroe from?
> A. Privacy. It is my duty to provide privacy protection to all employees, per policy.
> E. Roesch deposition transcript, Exhibit 3, pg. 92.

Immediately after the findings of the CDI were shared with the Air Force, Mr. Monroe and his enablers re-intensified their harassment of Ms. Coleman. On November 3, 2016, Ms. Coleman was charged with an allegation of conduct unbecoming and a second unjustified AWOL.

> Q. (By Mr. Garcia-Tagle) Do you recall, Ms. Babb, that approximately three days after the CDI was completed, Ms. Coleman received a proposed five-day suspension for conduct unbecoming and being AWOL?
> A. (By Ms. Babb) Yes.
> Q. Do you recall, Ms. Babb, if the union filed a grievance on the proposed five-day suspension for conduct unbecoming and allegations of Ms. Coleman being AWOL?
> A. Yes.
> Q. Do you know what happened to the allegation and the proposed five-day suspension for conduct unbecoming and Ms. Coleman being AWOL?
> A. It was mitigated to a letter of reprimand.[3]
> C. Baab, deposition transcript, Exhibit 2, pg. 50. See also Exhibit 1, ¶¶ 18, 23.

### E. Ms. Coleman is returned to the CEX to work for Mr. Monroe

Unbelievably, instead of protecting Ms. Coleman from Mr. Monroe, who at that time knew the findings of the CDI, the Air Force returned Ms. Coleman to the CEX to work for Mr. Monroe.

> Q. (By Mr. Garcia-Tagle) Okay. Do you know why, Ms. Babb, Ms. Coleman was returned to the CEX to be supervised by Willy Monroe if there was two substantiated claims of unwelcome sexual advances and engaging in other conduct of a sexual nature and engaging in unprofessional relationships, against Mr. Monroe?
> A. (By Ms. Babb) I don't know.
> Q. In your experience, as a classification specialist or in any of the titles that you mentioned that you've held, do you see a reason or justification for returning Ms. Coleman to work under a supervisor that has been confirmed as committing unlawful sexual advances and maintaining unprofessional relationships?
> A. I have not had a similar experience.
> C. Babb deposition transcript, Exhibit 2, pg. 60.

---

[3] The AWOL claim was completely dropped, and the letter of reprimand was withdrawn one day before the Union and Ms. Coleman were set to arbitrate the unjustified discipline. *See Exhibit 1, ¶¶ 18, 23.*

11

Ms. Roesch also confirmed Defendant's obvious acts of retaliation by sending Ms. Coleman back to work for Mr. Monroe.

> Q. (By Mr. Garcia-Tagle)  Okay.· So you met with Ms. Coleman.· Did you tell Ms. Coleman that the CDI had no findings?
> A. (By Ms. Roesch) I didn't tell her any results.
> Q.· Okay.· You gave Ms. Coleman the option.· What options did you give her?
> A.· She could -- if she liked where she was at in real property, she could stay -- if it was real property.· She – you know, she -- she was, as far as I knew, doing well or she could choose to go back to CEX.
> Q.· Okay.· You gave her the option to return to CEX.
> A.· Both, yeah, or stay where she was at.
> Q.· Okay.· You didn't --
> A.· Or any other ideas she might have.· I was open.· I was committed.· We had a large organization.· I was really committed  to finding a good fit for her.
> Q.· Okay.· Why would you give her the option of returning to the CEX knowing that the CDI had found that Mr. Monroe had committed serious acts against her, adulterous relationship and the inappropriate sexual advances, against Ms. Coleman?
> A.· I was leaving her as many options available as she --as I could.· It was an option.· It was not -- it was her choice.
> Q.· But she didn't know that the CDI had found that Mr. Monroe had committed those actions --
> · · · · ·        Mr. Schottenstein:· Objection.
> By Mr. Garcia-Tagle (resuming):
> Q.· -- correct?
> · · · ·        Mr. Schottenstein:· Objection; calls for speculation.
> By the witness (resuming):
> A.· I don't know.· I didn't tell her.
> > *B. Roesch deposition transcript, Exhibit 3, pg. 87.*

Not surprisingly, soon after Ms. Coleman returned to work for Mr. Monroe, the hostilities against her increased.

> Q· ·Okay.· So this E-mail -- there is a couple of E-mails. The first E-mail is dated February 3rd, 2016, at 11:18 a.m., which is Page 2, an E-mail from Ms. Coleman to her supervisors and coworkers within the CEX.· Do you see that?
> A· ·Uh-huh.
> Q· ·Yes?
> A· ·Yes.· Yes, I do.
> Q.  So Ms. Coleman was returned to the CEX; correct?
> A· ·Yes, looks like it.
> Q· ·Okay.· And did you tell Mr. Monroe that Ms. Coleman would be coming back to the CEX?
> A· ·No.· I had my deputies do so.
> --

12

Q. Okay. This is an E-mail from Ms. Coleman, again, to her coworkers and supervisors asking about training sessions because she's returning to the CEX; correct?
A. It looks like it, yes.
Q. Okay. And then Ms. Coleman sends an E-mail stating that -- how she was treated by Mr. Clark and being told that if she didn't like the way things were done that she needed to quit, and you were copied on that; correct?
A. It looks like I was, yes.
--
Q. Okay. And what did you do to address this issue, ma'am?
A. I met with my deputies and said, Please look into this and take the appropriate action. This needs to be addressed.
Q. Okay. And do you know what they did?
A. I don't.
--
Q. Okay, this was further harassment; correct?
A. That was my understanding--
   *B. Roesch deposition transcript, Exhibit 3, pgs. 93-98. See Exhibit 9.*

### F. **Mr. Monroe threatens and physically assaults Ms. Coleman**

Not unexpectedly, and not unlike the current headlines, Mr. Monroe felt emboldened by Defendant's inaction and escalated the attacks on Ms. Coleman. On February 12, 2016, Mr. Monroe physically threatened and physically assaulted Ms. Coleman while at work.

In her deposition, Ms. Babb acknowledges Mr. Monroe's acts but refuses to provide details of the threat and assault.

Q. (By Mr. Garcia-Tagle) Do you recall that when Ms. Coleman was returned to the CEX, that less than a month later, on 12 February 2016, Mr. Monroe assaulted Ms. Coleman?
A. (By Ms. Babb) Yes.
Q. (By Mr. Garcia-Tagle) Ms. Babb, what do you recall about the allegation that Mr. Monroe assaulted Ms. Coleman 12 February 2016?
A. From my recollection, there was a claim of a threat to Ms. Coleman.
Q. Do you recall if there was any physical contact?
A. The specific nature of the contact, I do not recall.
Q. But do you recall if there was any contact made by –
A. Yes.
Q. What do you recall?
A. I don't recall the specifics. I know there was the claim of some type of contact, but what specifically it was on that date, I don't know.
Q. Do you recall if Ms. Coleman reported the assault to the police?
A. I don't.

13

> Q. Do you recall the police investigating the allegation that Mr. Monroe assaulted Ms. Coleman
> A. I don't.
> Q. Do you recall if Ms. Coleman was detailed to another assignment as a result of the assault committed by -- or the alleged assault committed by Mr. Monroe?
> A. I know that she was detailed shortly thereafter. The exact cause or reason behind that detail, I can't confirm.
>
> *C. Baab, deposition transcript, Exhibit 2, pg. 50.*

On February 16, 2016, Ms. Coleman filed a police report detailing Mr. Monroe's assault against her. *See Exhibit 1 and Exhibit 4.* On the same day, both Ms. Coleman and Ms. Stripling meet with Brig. General Robert LaBrutta's associate, Felipe Jimenez, the highest-ranking civilian at JB-SA. During that meeting, Mr. Jimenez instructed Ms. Coleman to temporarily report to job with CEA instead of returning to work for Mr. Monroe in the CEX because he said it was not safe for her. *See Exhibit 1, ¶24.*

On March 14, 2016, as a result of the on-going assault investigation, Mr. Roesch presented Ms. Coleman with three (3) options for work detail. *Exhibit 5.* Given those three (3) options, Ms. Coleman selected the Engineering Technician position with CES/CENME. *Id.* Pursuant to the terms of the detail, the detail was for a maximum of one (1) year and had to be reapproved every one hundred and twenty (120) days. *Id. See Exhibit 6, pgs. 20-22.*

Ms. Roesch promised Ms. Coleman that Ms. Coleman would be given the training and support necessary to be successful in the detail. *See email from Ms. Roesch to staff, Exhibit 7; Roesch transcript, pg. 114, Exhibit 3.* The detail (as an Engineering Technician) involves drafting in AutoCad and working with ArcGIS, which Ms. Coleman had no experience working. *See Exhibit 6, pgs. 21-22 and Exhibit 1.*

**G. Ms. Coleman's current detail as an Engineering Technician**

Ms. Coleman has been detailed as an Engineering Technician for more than four (4) years without any follow-up confirmation of her detail and without any training or support to

14

perform her job duties.[4] Ms. Coleman has suffered on-going career ending retaliation, and relentless and extreme hostility from her superiors. *See Exhibit 1, ¶32.*

> Q. (By Mr. Garcia-Tagle) The 120-day increments. Does it need to be confirmed in writing to
>   continue her position with the engineering technician?
> A. (By Ms. Roesch) Typically, yes, there's paperwork.
> Q. Okay. Do you know why they wouldn't have given her the detail information?
>   Mr. Schottenstein: Objection; foundation.
> By the Witness (resuming):
> A. This is the first time hearing she didn't get it.
> Q. Okay. What happens if you don't --
> A. She should have.
> Q. What happens if you don't get the documentation that shows that you're in this detail for 120-day increments?
> A. Well, it's as you stated: It doesn't show up in your career brief.
> Q. And what happens if it doesn't show up in your career brief?
> A. It's not there.
>   B. Roesch deposition transcript, Exhibit 3, pg. 118.

As a result of Defendant's intentional acts of retaliation, since Ms. Coleman has not received any updated detail confirmations for more than four (4) years, her career brief shows a four (4) year void.

In her current position, Ms. Coleman has been continually harassed and retaliated against. Ms. Coleman has not been given the training necessary to be able to learn the work and has not been given any work assignment for more than two (2) years. Ms. Coleman reports to work every day and sits at her desk without any assignments. *See Exhibit 1.* In his deposition, Michael Arzate (hereinafter "Mr. Arzate"), Ms. Coleman's current supervisor stated that the

---

[4] Ms. Coleman remains permanently assigned to the CEX and is listed as an Emergency Flight Specialist in her electronic work history record, also known as Career Brief. However, since she has not been allowed to attend any trainings, simulations or continuing education courses, she has lost all her certifications as an Emergency Flight Specialist, thereby severely impacting her career as an Emergency Specialist. Moreover, Ms. Coleman has been a GS-9 for over 10 years, while most of her contemporaries in the CEX have been promoted to GS-11 grades. *See Exhibit 1 ¶32.*

15

March 14, 2016 letter that detailed Ms. Coleman to his section for one (1) year which meant that as of March 2017, he was "*done*" with her.[5]

> Q· Well, Ms. Coleman says she's in your section.· If she's not getting the details updated, then there's no record in her file that shows that she's been detailed to your section; correct?
> A· That letter also states that she's detailed for a maximum one year.
> Q· ·Correct.
> A· ·**I was done with her in 2017.** (Emphasis added)
> Q· ·You were -- I'm sorry.
> A· ·I -- I would have been done with her in 2017 as a result of the detail.
> Q· ·Okay.· So --
> A· ·So...
> Q· ·-- what would that mean?· That you --
> A· ·I should not be her supervisor anymore.
> *M. Arzate, deposition transcript, Exhibit 6. pg. 16.*

Mr. Arzate goes on to confirm that he has not received any responses or support from civilian personnel concerning the issue of Ms. Coleman's unauthorized four (4) year detail.

> Q. (By Mr. Garcia-Tagle)· Okay.· And you're stating that it is a problem for you because you shouldn't be her supervisor at this point.
> A. (By Mr. Arzate) Correct.
> Q.· ·Okay.· So are you interested in trying to find out if you're going to be assigned to be her supervisor?
> A.· I've asked multiple times what the situation is with Ms. Coleman.
> Q.· Who have you asked?
> A.· I've asked civilian personnel; I've asked supervision leadership -- in separate meetings with leadership.
> Q.· Okay.· What does civilian personnel say?
> A.· Civilian personnel says -- they don't really say anything.· I got crickets back, so...
> Q.· Crickets from --
> A.· Yeah.
> *M. Arzate, deposition transcript, Exhibit 6, pgs.17-18.*

As a result, Mr. Arzate has refused to give Ms. Coleman any substantive training or work assignment because he claims that Ms. Coleman does not have the background or proper education to perform the tasks of an Engineer. Contrary to the statements made by Mrs. Roesch

---

[5] In 2017, Ms. Algueseva retired and Mr. Arzate, who was Ms. Algueseva's superior, became Ms. Coleman's direct supervisor.

16

concerning training for Ms. Coleman, Mr. Arzate has not offered training for Ms. Coleman to succeed as an Engineering Technician. *See Exhibit 7.*

> Q· ·(By Mr. Garcia-Tagle) Okay.· And were you informed of what you needed to do as far as training Ms. Coleman?
> A· ·(By Mr. Arzate) They just said, you know, let -- bring her in, bring her on board, bring -- see if you can bring her up to speed, see what you can do, see if she enjoys it and go from there.
> Q· ·What about training?· Were you supposed to train Ms. Coleman?
> A· ·I don't know if they actually said anything specifically about training but we did send Ms. Coleman to training twice.· We sent her twice for each of the two different software packages that we actually use.· We use AutoCAD and we ArcGIS, and we sent her to each one of those classes twice. Keep in mind that those classes are for someone, basically, who already has that background to a certain degree.· AutoCAD require -- most people require an associate's degree in AutoCAD to even know the program.· You don't very seldomly get someone with very minimal experience on board.· They won't even be referred for the position.
>
> *M. Arzate, deposition transcript, Exhibit 6, pg. 21.*

Mr. Arzate's deposition was taken on August 15, 2019 and he testified that he has not assigned Ms. Coleman any work since 2018.  Moreover, he states that the work he assigned Ms. Coleman in 2018 might have taken Ms. Coleman one or two weeks to complete.

> Q.· How many months has it been since you've given her any tasks?
> A.· How many months has it been since I have given her any task.
> Q.· Correct.· You talked about -- and I'll let you think about it a little bit, but you talked about her rewriting some specifications.· Do you know what number year that was?
> A.· I -- it was last year, so it was 2018.
> Q.· 2018.
> A.· Yeah.
> Q.· And you said it took maybe days to complete.
> A.· I would say it would take at least days to complete, yes.
> Q· ·And that was in 2018.
> A.· Yeah.
> Q.· Do you approximate a month?
> A.· I have no idea.
> Q.· Okay.· Just 2018?
> A.· 2018.
> Q.· Okay.· And that was the last work duty you gave her; is that right?
> A.· Correct.
> Q.· What does she do at her desk -- what has she been doing at her desk since then?
> A.· From what I've seen that she's been doing at her desk, she spends a lot of time on her cell phone.· I know that she has another business, and I believe she's working a lot, taking care of that other business.· The other thing is that she spends a lot of time

      with some of the other employees.· They'll come in and have a sit down, have discussions with her at her desk, and I don't ask what the discussions are.· It's not -- none of my business, so...
Q.· Okay.· But no work duties.
A.· No.·
*M. Arzate, deposition transcript, Exhibit 6, pgs. 57- 58.*

In addition to the complete devastation of her career, Ms. Coleman works in a hostile environment.  John Dotter, (hereinafter "Mr. Dotter") an Engineering Technician who worked alongside Ms. Coleman in 2017 describes the conditions Ms. Coleman faces as under her supervisors. In his declaration, Mr. Dotter describes the hostility Ms. Coleman is subjected to daily, including constant and severe hostility and humiliation. *See declaration of John Dotter, Exhibit 8.*

### III.     LEGAL ANALYSIS

Despite the lack of a definitive decision by the Fifth Circuit on a claim of retaliatory hostile work environment, district courts in the Fifth Circuit have long recognized a claim for retaliatory hostile work environment. *Rowe v. Jewell*, 88 F. Supp. 3d 647, 673 (E.D. La. 2015); *Tejada v. Travis Ass'n for Blind*, No. A-12-CV-997-DAE, 2014 U.S. Dist. LEXIS 86590, 2014 WL 2881450, at *3 (W.D. Tex. June 25, 2014). See *Fallon v. Potter*, 277 F. App'x 422, 426-28 (5th Cir. 2008).

In order to establish a *prima facie* case for a retaliatory hostile work environment, a plaintiff must prove: (1) the employee engaged in protected activity; (2) the employee was subject to harassment; (3) there was a causal connection between the protected activity and the harassment; and (4) the harassment affected a term, condition, or privilege of employment. *Rowe*, 88 F. Supp. 3d at 673; *Baird*, 2016 WL 80629, *6. Protected activity includes informal as well as formal complaints or demands under Title VII.

For harassment to affect a "term, condition, or privilege of employment," it must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Smith v. Harvey*, 265 F. App'x 197, *4 (5th Cir. 2008). Whether an environment is hostile or abusive can be determined only by looking at the totality of the circumstances including, "the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with the employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). This inquiry involves a subjective and objective component. *Id.* at 21-22.

## IV.    CONCLUSION

In our facts, Ms. Coleman provides ample evidence that she has engaged in protected activity under Title VII. Ms. Coleman she repeatedly reported harassment, retaliation and assaults committed by Mr. Monroe and his enablers to the EEO Office, her supervisors, investigators, law enforcement and others. Moreover, Ms. Coleman's actions regarding Ms. Wilson's EEO case is also protected activity. Ms. Coleman has presented abundant evidence that she was and still is subjected to unwelcome harassment, hostility and retaliation that have permanently damaged Ms. Coleman's employment career.

The evidence clearly shows there is a causal connection between the hostility Ms. Coleman has endured and her protected activity because she has faced persistent harassment and humiliation since exercising her protected rights. Ms. Coleman has demonstrated that Defendant's hostility and intentional acts of retaliation, including keeping her in limbo for more than 4 years, has and continues to negatively affect the conditions of her employment.  The more than four (4) years of working without proper documentation or confirmation of Ms. Coleman's detail has left an irreparable void in her Civil Service Career Brief.  This void amounts to

approximately one-half of Ms. Coleman's career as a civil service employee. In addition, since Ms. Coleman has also been prevented from working as an Emergency Flight Specialist, she has lost her required certifications to be employed as an Emergency Management Specialist. The loss of these certifications has put Ms. Coleman in a position lower than what she stared with in 2010. Defendant's invidious *modus operandi* that has included a program of relentless hostility against Ms. Coleman in the hope that she would quit has been thwarted by Ms. Coleman's strength and sense of justice. Ms. Coleman now seeks the Court's assistance to reclaim her life and career.

THEREFORE, for the foregoing reasons, Ms. Coleman has come forward with sufficient evidence to establish all the elements of her claim, and the Court should grant her Motion for Summary Judgment.

Respectfully Submitted,

By: /s/ Ricardo A. García-Tagle
Ricardo A. García-Tagle
Bar Number 24025375
315 S. St. Mary's Street
San Antonio, TX 78205
210.444.1599(Tele)
210.855.6098(Fax)
**ATTORNEY FOR PLAINTIFF**

CERTIFICATE OF SERVICE

I hereby certify that on July 12, 2020, I electronically filed the foregoing document with the Clerk of the United States District Court, Western District of Texas, San Antonio Division, using the electronic case filing system of the Court with service to the following:

Dingivan, James, Assistant United States Attorney
Western District of Texas
601 NW Loop 410, Ste 600
San Antonio, TX 78216

/s/ Ricardo A. García-Tagle